UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
J & J Sports Productions, Inc.,                             PLAINTIFF'S AFFIDAVIT

                              Plaintiff,
    - against -

                                                   Case No.: 1:19-cv-03907-JPO

Francisco Mendez, individually and d/b/a
Mendez Boxing; and Mendez Boxing Fifth Ave., Inc.,
an unknown business entity d/b/a Mendez Boxing

                              Defendant(s).
-----------------------------------------------------------------X
STATE OF CALIFORNIA      )
                                  ) SS:
COUNTY OF SANTA CLARA  )

    JOSEPH M. GAGLIARDI, being duly sworn, depose and state the following:

    1. I am the President of Plaintiff, J & J Sports Productions, Inc., and as such I am fully familiar with the acts, circumstances, and proceedings heretofore had herein.

    2. I make this affidavit in support of Plaintiff's Application for Default Judgment.

    3. J & J Sports Productions, Inc. is a closed circuit distributor of sports and entertainment programming. Our company purchased and retains the exclusive commercial exhibition (closed circuit) licensing rights to: *"Saul Alvarez v Amir Khan WBC Championship Fight Program*, telecast nationwide on Saturday, May 7, 2016 (hereinafter the "Program"). This Program included the main event between *Saul Alvarez v Amir Khan*, as well as all under-card bouts and commentary encompassed in the television broadcast of the event. Our company thereafter marketed the sub-licensing (commercial exhibition) rights to our company's commercial customers (e.g., casinos, racetracks, bars, restaurants and nightclubs). At no time did J & J Sports Productions, Inc. sublicense the Program to Francisco Mendez, individually and d/b/a Mendez Boxing or Mendez Boxing Fifth Ave., Inc. an unknown business entity d/b/a Mendez Boxing (hereinafter "Defendant(s)"); moreover,

as J & J. Sports Productions, Inc. purchased and retains the exclusive commercial distribution rights, no other company was authorized to transmit the Program to Defendant(s). In other words, the Program was legally available to commercial establishments, including those in New York, only through an agreement with. Plaintiff.

4. The contract attached as **Exhibit "1"** hereto is a true and accurate representation of the original Closed Circuit Television License Agreement I signed to obtain the exclusive commercial distribution rights to the Program.

5. With the advent of pay-per-view programming, we began to experience serious erosion in the sales of our own proprietary programming to our commercial customers throughout the United States. In response, we embarked upon a nationwide program to police our signals for the purpose of identifying and prosecuting commercial establishments that pirate our programming, including the Program that forms the subject of this lawsuit,

6. J & J Sports Productions, Inc. retained auditors and law enforcement personnel to detect and identify signal pirates. To ensure that only locations that illegally obtained the Program were visited by the auditors, our company compiled our confidential list of customers (authorized and legal locations) who paid the required license fee to broadcast the Program, and this list was distributed to participating auditing and law enforcement agencies in strict confidence.

7. The above-referenced Program contained several televised under-card bouts and, color commentary, along with the main event. As set forth within the sworn affidavit of Jesse Divers, the main event between *Saul Alvarez v Amir Khan* (which was part of the Program herein) was observed as being unlawfully exhibited by the establishment doing business as Mendez Boxing. At no time did Mendez Boxing ever lawfully license the Program from J & J Sports Productions, Inc. for such a purpose.

8. Domestic commercial establishments that wished to broadcast the Program were required to pay to my company a commercial sublicense fee to broadcast the Program. This sublicense fee for the Program was based on the capacity of the establishment and varies for each event. (Rate Card. **Exhibit 2**). The commercial sublicense fee for this establishment was $2,200.00.

9. It is essential that I communicate to the Court that to the best of my knowledge our programming is not and cannot be mistakenly, innocently or accidentally intercepted. This is because our programming is encrypted and it is only after we authorize a commercial activation that a commercial establishment may broadcast our signal.

10. There are several methods by which a signal pirate can unlawfully intercept and broadcast our programming - included among these are (without limitation):

A. The use of a "blackbox", "hotbox", or "pancake box" which is purchased for a fee and when installed on a cable TV line will allow for the descrambled reception of a pay-per-view broadcast, or

B. The use of a "smartcard" or "text card" or "programming card" which is purchased for a fee and when installed on a LASS satellite receiver line will allow for the descrambled reception of a pay-per-view broadcast, or

C. The purposeful misrepresentation of a commercial establishment as a residential property to allow the fraudulent purchase of pay-per-view (or prohibited) programming at the residential rate, or, notwithstanding the existence of a commercial account, the purchase of the particular Program by a commercial establishment at a residential rate in violation of the terms of service of the business account provider.

D. The use of illegal cable drop or splice from an apartment or home adjacent to the commercial establishment premises: (which would purchase the broadcast at a residential price and

divert the program to the commercial establishment), and/or

E. The purchase of other illegal unencryption devices, and the purchase of illegal satellite authorization codes which are readily available on the internet, in trade publications, and through "word of mouth."

11. By way of information, I wish to explain to the Court how the encryption process works. In the parlance of the industry, my company is known as a "closed-circuit distributor". This term dates back to the days when sporting events were exhibited to viewers at venues (i.e., theaters, armories, banquet halls, auditoriums) that were leased and the television broadcast signal of the event being exhibited at these venues was transmitted on a closed-circuit basis. In order to safeguard against the unauthorized interception or receipt of the Program, the interstate satellite transmission of the Program was electronically coded or scrambled and was not available to or intended for the use of the general public. If a commercial establishment was authorized by Plaintiff to receive the Program, the establishment was provided with the electronic decoding equipment and the satellite coordinates necessary to receive the signal, or the establishment's cable or satellite provider would be notified to unscramble the reception of the Program for the establishment, depending upon the establishment's equipment and provider. (Aside from these commercial activations our company maintains no other relationship with programming providers.)

12. It is respectfully submitted to this Honorable Court that the unchecked activity of signal piracy not only has resulted in our company's loss of several millions of dollars of sales revenue, but also has a detrimental effect upon lawful residential and commercial customers of cable and satellite broadcasting whose costs of service are increased significantly by these illegal activities, including the deprivation of tax revenue to the communities where our potential customers reside, and the denial of benefits such tax revenue would provide the residents of such communities.

13. The persistent signal piracy of our programming costs our company, our customers, and their communities, millions of dollars annually resulting, in significant part, from the perceived lack of significant consequences (including nominal or minimal damage awards by the Courts that hear our cases).

14. For these reasons I ask this Honorable Court to grant up to the maximum allowance for statutory damages due to the fact that such actions are actions are per se intentional and, and do not and cannot occur without willful and intentional acts purposely designed to obtain our programming unlawfully.

15. Some courts have placed undue weight upon whether the promotion of programming by the signal pirates (rather than the exhibition of the programming itself) was done willfully and/or for commercial benefit. I would ask this Court to recognize that the willful and purposeful acts necessary to intercept and exhibit the programming precede whatever steps are (or are not taken) by the pirate establishment to promote our programming to their customers.

16. Based on my experience in the industry, pirates do not generally advertise the fact that they intend to exhibit our programming unlawfully to the public for the practical reason that they wish to avoid the unessential risk of detection. This of course does not preclude the very real possibility that the unlawful exhibition may well have been promoted by word of mouth or advertising that went undetected by our auditors, to their own customers to increase their financial gain on the night our programs are broadcast at their establishment.

17. Based on my experience in the industry, it is extremely unlikely that a pirate establishment would increase the costs of food or drink on the evening they broadcast one of our programs unlawfully. In fact, it is uncommon that even our legal locations would employ such a method to recover some of our commercial license fee back from their own customers. Our auditors

do not benchmark the prices charged for food or drink at the pirate locations subsequent to conducting the field surveillance on the evening our programming is broadcast, and thus it is undetermined whether the prices paid by an auditor at a pirate location on the night of the Program are in fact less than or equal to the normal prices charged by the pirate establishments.

18. Based on my experience in the industry, the overwhelming majority of pirate establishments do not, and likely will not ever charge a cover or door charge to their customers on the evening our programming is exhibited. To do so would defeat the very purpose of pirating our programming in the first place, i.e., to lure or retain customers who seek to be entertained by our programming. If the pirate demanded a cover charge of its patrons then the competitive advantage the pirate held over our lawful (who regularly impose a cover charge), would dissipate and the pirate's patrons would be faced with a choice of viewing our programming at the pirate establishment or at our lawful customer's locations where the broadcast environment may be much more attractive (i.e., more monitors, bigger monitors, no risk of interference or interception, etc.).

19. Mendez Boxing had no justification to steal our programming and exhibit it for its own financial benefit, and its actions denied our company of the commercial license fee to which it was rightfully entitled.

*[signature]*
Joseph M. Gagliardi, President
J&J Sports Productions, Inc.

see attached notarization

**CALIFORNIA JURAT WITH AFFIANT STATEMENT**                    GOVERNMENT CODE § 8202

☒ See Attached Document (Notary to cross out lines 1–6 below)
☐ See Statement Below (Lines 1–6 to be completed only by document signer[s], not Notary)

1. _____
2. _____
3. _____
4. _____
5. _____
6. _____

Signature of Document Signer No. 1          Signature of Document Signer No. 2 (if any)

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of __Santa Clara__

[Notary Seal: SHARON CUNNINGHAM, Commission # 2133061, Notary Public - California, Santa Clara County, My Comm. Expires Nov 10, 2019]

Place Notary Seal and/or Stamp Above

Subscribed and sworn to (or affirmed) before me
on this __8th__ day of __July__, 20__19__,
by       Date              Month        Year
(1) __Joseph M. Gagliardi__
(and) (2) __n-a_____),
           Name(s) of Signer(s)

proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

Signature __Sharon Cunningham__
           Signature of Notary Public

──────────── OPTIONAL ────────────

Completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.

**Description of Attached Document**

Title or Type of Document: __Plaintiff's Affidavit__
Document Date: __July 8, 2019__          Number of Pages: __6__
Signer(s) Other Than Named Above: __none__

©2017 National Notary Association

Mendex Boxing Fifth Ave.

5-7-2016

# Exhibit 1

GOLDEN BOY PROMOTIONS, LLC
626 Wilshire Blvd., Suite 350
Los Angeles, California 90017

March 31, 2016

<u>VIA EMAIL</u>
J & J Sports Productions, Inc.
2380 South Bascom Avenue, Ste. 200
Campbell, CA 95008

Attention: J.M. Gagliardi

RE:   CLOSED CIRCUIT TELEVISION LICENSE AGREEMENT

   Saul "Canelo" Alvarez v. Amir Khan
   Scheduled 12 round Middleweight Championship Bout
   Plus selected undercard bouts
   (Fighters subject to change)

   T-Mobile Arena
   Las Vegas, Nevada
   Saturday, May 7, 2016

Gentlemen:

   This will confirm the terms of our agreement whereby GOLDEN BOY PROMOTIONS LLC ("**Promoter**") hereby grants to J&J Sports Productions ("**J&J**" "**you**" or "**Licensee**") the exclusive license to exhibit Promoter's live **English language** telecast (the "Telecast") of the captioned Bout and accompanying undercard matches (the "**Event**"), simultaneously with the Event, only within the fifty states of the United States of America (with the exception of Clark County Nevada, which shall be "blacked out" unless Licensee receives written authorization by Promoter to exhibit the Event within Clark County) and **Canada** (the "**Territory**"), only at commercial closed circuit television exhibition outlets, such as bars, clubs, lounges, restaurants and the like, each with a fire code occupancy capacity **not to exceed**      **persons per outlet** (except for outlets within casinos where the seating capacity may exceed      persons per outlet), located within the Territory. The Exhibition rights granted herein <u>do not include</u> any rights to exhibit the Telecast in the Commonwealth of Puerto Rico, Mexico, transmissions to hotel guest rooms, in-flight aircraft or other transportation facilities, nor does it include the right to exhibit the Event in any language other than English (which is expressly reserved by Promoter). Any proposed closed circuit exhibition of the Event at arenas, racetracks or theaters (if Promoter does not execute the

1

Fathom Agreement as defined below) shall be subject to the prior written approval of Promoter, which approval may be granted or refused in the discretion of Promoter.

1. <u>License Fee.</u> As full and complete compensation for the rights granted to Licensee by Promoter, you shall pay to Promoter the license fee calculated as follows:

   a. Licensee shall pay the Minimum Financial Guarantee of (the "**Minimum Financial Guarantee**"), pursuant to the provisions of paragraph 2;

   Then, the amount of all gross revenues in excess of the first (which threshold amount Licensee shall retain in recoupment of the Minimum Financial Guarantee) which Licensee receives from all closed circuit television exhibitions of the Event in the Territory shall be payable as follows:

   i. to Licensee;

   ii. Deduct Marketing and credit card costs up t               of revenue;

   iii. Deduct Sales commission up                                ;

   iv. The remaining revenue balance shall be                     to Licensee

   b. For avoidance of doubt, if Promoter executes the Fathom Agreement (as defined below), then Licensee shall not license any theaters in the Territory and License Fees shall expressly exclude any and all revenues and monies derived from or relating to the sale, license or other exploitation of the rights granted to Fathom pursuant to the Fathom Agreement.

   c. All amounts which are to be deducted or withheld by your sublicense exhibitors, sales agents or distributors from payments to you or your sublicensees shall be subject to the mutual agreement of Promoter and Licensee but shall not ex of gross revenues (excluding authorization fees) from each outlet from exhibition of the Event.

   d. In the event that you should sublicense an outlet for a fixed lump sum or for a license fee which includes a guaranteed amount which is not exceeded by your share of revenues from that outlet, you shall include in gross revenue hereunder the amount equal to such lump sum or guarantee.

   e. You shall provide the services of a duly authorized representative of your organization who shall be present at each licensed and sublicensed outlet immediately prior to

2

and during the telecast of the Event, to monitor compliance with the terms of this Agreement and report on attendance figures and the collection of admission fees.

    f.  You shall be entitled to deduct and withhold, for advertising and publicity purposes, up to ⬚ of gross revenues from exhibition locations which you license directly to operators, other than Licensee or its affiliates, without any commission or distribution fee to third party sales agents or distributors.

    g.  Licensee shall be responsible for all of its local advertising materials, such as posters, press kits and slides, including the option to use Event posters to be supplied by HBO-PPV. All advertising materials shall be subject to Promoter's prior written approval.

    h.  The calculation of gross revenues shall not include the amount of any fees or taxes referenced in this Agreement paid or required to be paid hereunder.

    i.  Licensee acknowledges that Promoter intends to enter into an agreement with Fathom for the sale, license or other exploitation of the rights of the Event and its exhibition in movie theaters.

    j.  Licensee agrees to authorize the exhibition of the Event in Las Vegas casino at the sole direction of Promoter. For avoidance of doubt, License Fees shall expressly exclude any and all revenues and monies derived from or relating to the sale or license of the exhibition of the Event at casino locations in Las Vegas.

  2.  <u>Minimum Financial Guarantee and License Fee Overage Payments.</u>

    a.  As minimum guarantee and non-refundable advance against the License Fee due to Promoter pursuant to Paragraph 1 of this Agreement for the Event, you shall pay to Promoter the sum of ⬚ , not later than ten business days prior to the Event; and

    b.  The Minimum Financial Guarantee amount shall be paid by:

     i.  a certified check or bank cashier's check payable to "Golden Boy Promotions, LLC" in such amount; or

     ii.  bank wire delivered to:

       Name of Bank
       Bank Street Address
       City, State, Zip Code
       Attn.:
       Bank Routing Number

Account No.
(to be provided by Promoter)

    c.    Payment of all license fee amounts in excess of the applicable Minimum Financial Guarantee for the Event shall be due and payable to Promoter not later than te           business days after the Event.

    3.    <u>Compatible Decoding Equipment</u>. You and your sublicensees shall be responsible to obtain, at your or their cost and expenses, either:

    a.    Authorization to receive the Event through the services of one or more direct satellite suppliers ("DSS"), such as DirecTV or DISH Network, to be selected by you and approved by Promoter in writing in advance; or

    b.    If Promoter licenses VUBIQUITY (formerly ABAIL-TVN) to distribute the Event by C-Ban and so notified Licensee, authorization to receive the Event through VUBIQUITY.

    c.    DSS and VUBIQUITY, if applicable, shall be responsible for the encoding and decoding of their retransmitted signals.

    d.    You shall not charge decoder rental or authorization fees to your sublicensees in excess of                          per decoder or authorization. Any additional equipment charges to your sublicensees shall be at your cost.

    4.    <u>Addressing of Decoders</u>

    a.    Promoter shall deliver either, as Promoter shall elect in its discretion, (i) the encrypted transmission of the video and audio signal of its telecast of the Event to a domestic satellite or other delivery point from which the signal is capable of being received by DSS and VUBIQUITY, for redistribution to your designated outlets or (ii) by fiber optic cable to a delivery point at which the signal is capable of being received by DSS and VUBIQUITY, for redistribution to your designated outlets. Such delivery to the delivery point shall constitute full and complete discharge of the obligations of Promoter to you hereunder. DSS and VUBIQUITY, if applicable, as the case may be, shall have the responsibility to address and authorize decoders for your authorized sublicensees. You shall be responsible for all charges for addressing and authorizing your sublicensees, as well as all costs and expenses necessary for the reception of the signal and for the projection at the outlets.

    b.    Promoter shall have no responsibility for your decoder authorization fees, and Promoter shall have no responsibility or liability to you or your sublicensees for any technical failures which may occur in connection with the authorizing of decoders for your sublicensed closed circuit exhibition outlets or in connection with any retransmission or authorizing by DSS or VUBIQUITY, and in such case, you remain responsible for payment of the License Fee to Promoter

4

        c.      You shall instruct DSS and VUBIQUITY, if applicable, to provide directly to Promoter, on the first business day after the Event, their complete final sublicense reports which shall indicate the name, address and city of each sublicensed outlet and the decoder number for each sublicensed outlet.

5.      <u>Pay-Per-View Exhibitions, Delayed Pay Cable Telecasts and Online Internet Transmissions.</u>

You acknowledge the Promoter will be licensing the live and delayed cable television, direct broadcast satellite television and digital online internet transmissions and exhibitions of the Event in the Territory on a residential pay-per-view basis, with subsequent pay cable delayed telecasts, and that you shall have no interest or participation in such exhibitions or any other exploitation of the Event. Accordingly, Licensee has no right to record, duplicate or copy the Event by any means or to exhibit, reproduce or retransmit the Event or any portion thereof. The Telecast shall be exhibited in its entirety without alterations or changes of any nature, simultaneous with the Program.

6.      <u>Anti-Piracy.</u>

You and your sublicensees shall use their reasonable best efforts to employ adequate security systems and other measures to prevent theft, pirating, copying, duplication or unauthorized exhibition or transmission of the Event. You and your sublicensees shall promptly advise Promoter of any piracy (i.e., unauthorized use or proposed use) of the telecast in the Territory. Promoter and Licensee, acting jointly, shall have the right to commence or settle any claim or litigation arising out of the alleged piracy, use or proposed use of the telecast in the Territory. Promoter and Licensee shall notify each other in writing and shall consult with each other and mutually agree before commencing or settling any such claim or litigation in the Territory. Any damages, whether statutory, compensatory, punitive or otherwise, which Promoter or Licensee may recover from the theft, piracy, copying, duplication, unauthorized exhibition or transmission of the Event in the Territory, after payment of reasonable legal fees and disbursements, shall constitute gross revenues from the Event, to be shared by, and distributed to, Promoter and Licensee as provided in Paragraph 1 of this Agreement. Licensee shall advance all required legal fees and disbursements, subject to recoupment from any application recovery, and shall report all expenses, settlements and recoveries to Promoter on a quarterly basis. Your sublicensees shall have no right to commence or settle any claim or litigation arising out of the alleged piracy of the telecast hereunder without the prior written consent of Promoter.

7.      <u>Private Showings.</u> Promoter shall have the right, at its cost and expense and upon written notice to you, to conduct or authorize others to conduct up to _____ complimentary private showings of the telecast of the Event within the Territory, with no admission charge and no advertising or advance publicity for such private showings.

5

8.  **Attachments.**  Annexed to this Agreement as exhibits are the following documents, the terms and conditions of which are incorporated herein as if set forth in their entirety:

    a.  <u>Closed Circuit Television Sublicense Agreement</u> which you and your sublicensee shall complete and sign with respect to each closed circuit television outlet you may sublicense. YOU SHALL NOT ENTER INTO ANY SUCH AGREEMENT WITHOUT FIRST OBTAINING, PRIOR TO THE TELECAST OF THE EVENT, THE WRITTEN CONSENT AND APPROVAL OF PROMOTER TO THE TERMS THEREOF AND WITHOUT OBTAINING THE COUNTER-SIGNATURE OF PROMOTER ON THE SUBLICENSE AGREEMENT.

    b.  <u>Closed Circuit Television Standard Terms and Conditions</u> which shall apply to this Agreement as well as to the Closed Circuit Television Sublicense Agreement. YOU SHALL ATTACH A COPY OF THE STANDARD TERMS AND CONDITIONS TO EACH SUCH SUBLICENSE AGREEMENT.

9.  **Defaults.**

    a.  Your failure to deliver the Minimum Financial Guarantee as provided in Paragraph 2 hereof or to pay the license fee as provided in Paragraph 1 hereof or to pay the signal delivery fees or equipment expenses as provided in Paragraph 3 hereof or to comply with any other material term or condition of this Agreement or of the annexed agreements or the Standard Terms and Conditions shall permit Promoter, in addition to all of its other rights and remedies, to cancel this Agreement with you at any time without any further liability or obligation to you and to retain all monies paid to Promoter prior to such cancellation. Provided, however, that before Promoter may exercise any remedy with respect to any such default, Promoter must (i) provide Licensee with written notice specifying such default and (ii) if and to the extent that time reasonably permits prior to the event, provide Licensee with up to seven (7) days after Licensee's receipt of such default notice within which to cure such default.

    b.  If, in violation of the provisions of this Agreement, you or a sublicensee exhibits the Event in an outlet with a fire code occupancy limit in excess of _____ persons (except casino locations), then, in addition to the license fee for such outlet as provided in Paragraph 1, and in addition to and not in limitation of or in lieu of any other rights or remedies Promoter may have under this Agreement, at law or in equity, including, without limitation, Promoter's rights to indemnification hereunder, Licensee shall immediately pay to Promoter an amount equal to the following for each such outlet that violates the aforesaid restriction: the sum of the fire code occupancy capacity of the outlet multiplied by _____ of the face amount of the highest ticket or admission price for the Event at that outlet. You agree that this payment is reasonably calculated to reimburse Promoter for its damages in the event of such violation of this Agreement.

10. <u>No Packaging with Other Events.</u>

You shall not sublicense closed circuit television rights to the Event to exhibitors as part of a package which includes other boxing programs or bouts not included in this Event without the prior written consent of Promoter.

11. <u>Reports, Collection and Accounting.</u>

a. You shall be responsible for collection of all monies from outlets, and shall make all payments and provide all reports pursuant to Paragraph 4 of the Closed Circuit Television Standard Terms and Conditions and shall provide Promoter with copies of all reports received from sublicensed outlets. You shall distribute to Promoter all amounts due for exhibition rights to the Event, with no deductions, set-offs or holdbacks whatsoever.

b. In addition to the reports required in the Closed Circuit Television Standard Terms and Conditions, you shall provide Promoter with:

**Separate reports no later than 72 hours, 48 hours, and 24 hours before the Event and one week following the Event, including the name, locations and license fee for each closed circuit exhibition outlet and including method of signal delivery to each outlet and the information required in Paragraph 10(d) of the Closed Circuit Television Standard Terms and Conditions.**

**Promoter's representatives shall have the right to visit your offices and each outlet at any time during normal business hours prior to the Event and after the Event to obtain and verify such information, in person or electronically, and to make arrangements for the payment of all license fees due to Promoter promptly following the Event.**

All contracts and reports shall be sent to:

Golden Boy Promotions, LLC
626 Wilshire Blvd. Suite 350
Los Angeles, CA 90017

12. <u>Confidentiality.</u> Neither party shall disclose to any third party (other than its employees and agents, in their capacity as such, on a need-to-know basis), any information with respect to the terms and provisions of this Agreement except: (i) to the extent necessary to comply with law or the valid order of a court of competent jurisdiction, in which event the party seeking disclosure shall so notify the other   party as promptly as practicable (if possible, prior to making such a disclosure), (ii) as part of normal reporting or review procedure to its banks, auditors and attorneys and similar professionals, provided that such banks, auditors and attorneys and similar professionals agree to be bound by the provisions of this paragraph, and (iii) in order to enforce its rights pursuant to this Agreement.

.7

13. <u>Entire Agreement.</u> This Agreement supersedes and terminates all prior agreements between the parties hereto and their affiliates with respect to the subject matter contained herein, and this Agreement embodies the entire understanding between the parties relating to such subject matter, and any and all prior correspondence, conversations and memoranda are merged herein and shall be without effect hereon. It may not be altered, amended or discharged, except by a subsequent writing signed by the parties hereto. The laws of the State of Nevada applicable to contracts executed and to be fully performed in the State of Nevada shall govern this agreement, and execution of the agreement shall constitute the consent of Licensee and any sublicensee to exclusive jurisdiction of Nevada. Any dispute, controversy or claim arising out of or relating to this Agreement, including the formation, interpretation, breach or termination thereof, including whether the claims asserted are arbitrable, will be referred to and finally determined by arbitration in accordance with the JAMS Commercial Arbitration Rules before a single arbitrator who shall be selected by the parties to the arbitration and who shall be a retired judge or justice. If the parties are unable to select an arbitrator, the arbitrator will be selected in accordance with the JAMS Rules. The place of arbitration will be Las Vegas, Nevada. Judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. The prevailing Party in arbitration shall be entitled to its reasonable costs, including the costs of arbitration, and attorneys' fees.

Very truly yours,
GOLDEN BOY PROMOTIONS, LLC

By: _____  4/4/16
      Authorized Signature

Please confirm your agreement with the above by signing and returning the attached copy of this letter. This Television License Agreement shall not become effective unless and until Promoter has accepted and signed this Agreement and returned one copy to you.

ACCEPTED AND AGREED:

J&J Sports Productions, Inc.

By: _____

BY SIGNING THIS AGREEMENT, LICENSEE ACKNOWLEDGES HAVING READ THE CLOSED CIRCUIT TELEVISION STANDARD TERMS AND CONDITIONS AND CONFIRMS ITS AGREEMENT THERETO. NO CHANGES ARE AUTHORIZED IN THE CLOSED CIRCUIT TELEVISION STANDARD TERMS AND CONDITIONS.

# Exhibit 2

Mar. 8. 2017  3:30PM        G&G CLOSED CIRCUIT EVENTS                               No. 0297   P. 2



**CALL TO ORDER: 1-888-258-7115**

CLOSED CIRCUIT EVENTS LLC.
www.ggsportstv.com

# Saturday, May 7th, 2016 9pmET/6pmPT

From T-Mobile Arena, Las Vegas, Nevada
WBC World Middleweight Title

## Saul "Canelo" Alvarez

### vs

## Amir Khan

| Capacity  | Price      |
|-----------|------------|
| 1 - 100   | $2,200.00  |
| 101 - 200 | $3,200.00  |
| 201 - 300 | $4,200.00  |
| 301 - 500 | $5,200.00  |

-**DirecTV/DISH** HD And SD Activation is included.

-**Cable clients** – provider will bill Signal Fee

-Texas locations add **0.03% State tax.**

1-888-258-7115
2380 South Bascom Avenue, Suite 200 • Campbell, CA 95008 • Tel: (408) 369-8022 • Fax: (408) 369-8096

## CERTIFICATE OF SERVICE

I hereby certify that on July __17__, 2019, the foregoing document was filed with the Clerk of the Court and served in accordance with the Federal Rules of Civil Procedure, the Southern District's Local Rules, and this Court's requirement of certified mail service upon the following parties and participants:

    Francisco Mendez
    301 W 130th Street #LB New York NY 10027

    Mendez Boxing Fifth Ave., Inc.
    23 E 26th Street, New York NY 10010

Dated: July __17__, 2019

                                              JAMYLAA MARTINEZ